```
          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF MISSOURI
                EASTERN DIVISION
```

MARK TIBURZI and                )
CHERYL TIBURZI,                  )
                                 )
       Plaintiffs,              )
                                 )
  v.                             )    No. 4:08 CV 1151 DDN
                                 )
HOLMES TRANSPORT, INC.,          )
HOLMES TRANSPORT AND             )
LOGISTICS, LLC, and              )
JEFFREY D. KNIGHT,               )
                                 )
       Defendants,              )
                                 )
   and                          )
                                 )
FAMOUS FOOTWEAR/BROWN SHOE       )
COMPANY, INC.,                   )
                                 )
       Intervenor.              )

## OPINION

    This action is before the court for a decision, following a non-jury trial on the merits of the claims of plaintiffs Mark Tiburzi and Cheryl Tiburzi against defendants Holmes Transport Inc., Holmes Transport and Logistics, LLC, and Jeffrey D. Knight. Fed. R. Civ. P. 52(a). The claims of intervenor Famous Footwear/Brown Shoe Company Inc. for subrogation have been severed for a separate trial. All of the parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

    In their complaint, plaintiffs alleged that on July 15, 2008, defendant Jeffrey D. Knight, while operating a tractor trailer truck for defendants Holmes Transport, Inc., and Holmes Transport and Logistics, LLC, on Interstate 64-40 in St. Louis County, negligently drove his truck at high speed into the rear of a long line of stopped vehicles which were in a lane ramp traversing from that highway onto Interstate 270. Plaintiffs allege that defendants' vehicle struck the automobile driven by plaintiff Mark Tiburzi, inflicting severe injuries, as well as causing other injuries and damage to other vehicles and their occupants. Plaintiffs seek substantial compensatory damages for Mark Tiburzi's injuries, and for the loss of his services and the loss of consortium of

his wife, plaintiff Cheryl Tiburzi. Plaintiffs originally sought punitive damages. However, the punitive damages claim was withdrawn by plaintiffs before trial.

After consideration of the evidence adduced at the trial of the claims of plaintiffs Mark Tiburzi and Cheryl Tiburzi against defendants Holmes Transport, Inc., and Holmes Transport and Logistics, LLC, and Jeffrey D. Knight, the court makes the following findings of fact and conclusions of law:

## **FACTS**

1.  Plaintiff Mark Tiburzi at all times relevant to this action resided in Missouri and is a citizen of Missouri. On July 15, 2008, he was 51 years of age.

2.  Plaintiff Cheryl Tiburzi all times relevant to this action resided in Missouri and is a citizen of Missouri. On July 15, 2008, she was 46 years of age.

3.  Defendant Holmes Transport, Inc., is a corporation, organized under the laws of Alabama and engaged in the commercial transport of goods. Defendant Holmes Transport and Logistics, LLC, is a corporation organized under the laws of Alabama.

4.  Defendant Jeffrey D. Knight is a resident and a citizen of Alabama. At the time of the motor vehicle collision on July 15, 2008, while operating a tractor trailer truck in St. Louis County, Missouri, Knight was an employee of, and acting within the course and scope of his employment and agency for, defendant Holmes Transport, Inc.

5.  Mark and Cheryl Tiburzi were married on April 13, 1983. Since that date they have lived together as husband and wife, and have raised two children who are now adults. The Tiburzi's have one infant grandchild.

6.  On July 15, 2008, before the motor vehicle collision Mark Tiburzi was a happy, successful, loving, healthy, responsible, and energetic husband, father, friend to many, relative to many, and employee of Brown Shoe Company. Up to July 15, 2008, he provided his wife socialization, care, comfort, companionship, love, affection, and intimacy. Following the motor vehicle collision on that date, she has

provided Mark with supportive care and services and will continue to do so for the rest of his or her life.

    7.   Mark Tiburzi worked for Brown Shoe Company for many years. He was devoted to his job. By July 15, 2008, he had been promoted to the position of a District Sales Manager, supervising approximately 13 stores.

    8.   On July 15, 2008, at approximately 3:45 p.m., Jeffrey D. Knight was operating a tractor trailer truck unit on Interstate Highway 64-40 (I-64-40) eastbound in the far right lane approaching the interchange with Interstate Highway 270 (I-270). The tractor-trailer truck operated by Knight was transporting approximately 13 tons of scrap metal. The weather was clear and the view of the I-64-40/I-270 interchange was unobstructed for 1.7 miles to the west for eastbound traffic on I-64-40. As he approached the I-64-40/I-270 interchange in the far right lane, Knight intended to enter the southbound lanes of I-270. At that time, Knight was driving his tractor trailer truck 65 miles per hour. The posted speed limit for that area was 60 miles per hour. At this time, I-64-40 approaching the interchange with I-270 was congested with vehicle traffic. In the far right lane ahead of Knight at least 10 motor vehicles were lined up and stopped, preparing to enter I-270. As he approached the line of vehicles ahead of him, without slowing his tractor trailer truck and without keeping his eyes on the traffic ahead of him, Knight reached across the dashboard of his truck cab to grasp his cell phone, he obtained the phone, and he flipped it open, all without looking back through his windshield. When he looked back through his windshield, he saw that he was immediately behind the last vehicle in the line of vehicles preparing to enter I-270. He saw no rear brake lights or emergency flashing lights. Without applying his brakes or lessening the speed of his tractor trailer truck, Knight grabbed onto his steering wheel and his vehicle violently struck the rearmost vehicle in the line, an Audi automobile. The force of this impact caused the Audi to violently strike the left rear of the vehicle next in front of it, a Toyota Camry operated by plaintiff Mark Tiburzi. The force of this impact spun the Camry into the front of the tractor trailer truck operated by Knight. With the Camry wrapped around its

front, the tractor trailer truck proceeded to violently strike several vehicles in the line that were preparing to enter I-270. At rest, Mr. Tiburzi's Toyota was demolished totally and was wrapped around the front of the tractor trailer truck, with the Camry driver's side on the ground and passenger's side facing up. Three people were killed in the multi-vehicle collision and others were hospitalized.

9. After a considerable amount of time, after Emergency Medical Teams arrived on the scene, with the use of power equipment, plaintiff Mark Tiburzi was removed from the Camry and taken to St. John's Mercy Medical Center in St. Louis County.

10. The multiple vehicle collision involving the tractor trailer truck Jeffrey Knight operated was caused by Knight negligently driving at a speed that was unsafe due to the line of slowed and stopped vehicles ahead of him in the far right lane, by Knight's negligently driving at a speed that exceeded the posted speed limit, and by Knight's negligent failure to maintain a careful lookout to the roadway ahead of him because he negligently diverted his attention from the roadway ahead of him to look for and grasp his cell phone. The investigation of the Missouri State Highway Patrol included information that Jeffrey Knight maintained several log sheets for the same period of time, one of which indicated that he violated applicable regulations by operating the tractor trailer truck for an on-duty period of time that exceeded the maximum allowable period of on-duty time for an 8-day period.

11. Mark Tiburzi was brought to St. John's Mercy Medical Center in an unconscious condition. He was in a coma but responded to pain. An examination indicated that he had a right lung contusion, scalp lacerations, and traumatic brain injury.[1] His brain was severely swollen with blood from the collision impact. His thoracic and lumbar spinal areas were normal. His pelvis and abdomen were normal. A CT scan of his head indicated many severe hemorrhages. The physical condition of his brain and his condition generally were such that Mark Tiburzi's family was given counseling.

---

[1] A contusion is any injury in which the skin is not broken. Stedman's Medical Dictionary 348 (25th ed., Williams & Wilkins 1990). A laceration is a torn or jagged wound. Id., 833.

12. While he was treated at the Medical Center, Mark was ventilated. He tolerated monitoring, nutrition, sedation, and pain medication. He remained in a coma, he could not follow commands or spontaneously move any limb. He did not open his eyes to stimulation, but reacted to the discomfort of oral care. He was critically ill with neurologic and respiratory failure. He required passive, assisted range of motion exercises and stretching to increase muscle tone in his arms and legs. On August 2 he was still comatose, but reacted physically to stress or discomfort. By August 4, he opened his eyes more frequently. On August 5, he was examined by Lizette Alvarez, M.D., an expert in physical medicine and rehabilitation, who determined that he had tetraparesis.[2] Dr. Alvarez recommended range of motion movement, positioning and splinting, and the use of Baclofen and botulinum toxin injections to relieve muscular spasticity.[3] On August 6 he was still in a coma, but occasionally blinked his eyes in response to stimuli.

13. On August 8, 2008, Mark was transferred to St. John's Mercy Rehabilitation Hospital and underwent comprehensive inpatient rehabilitation to try to improve his cognitive and functional condition. On occasions he was transported back to the Medical Center for medical tests. On September 14, at the request of his family, Mark was given a second neurosurgical evaluation. The diagnosis was severe traumatic brain injury, currently in a vegetative state, post-traumatic delayed hydrocephalus, and possible widened predental space.[4] In October, a shunt was implanted in his head to remove fluid that was accumulating and which was believed to possibly be delaying some recovery. In October, a pump was placed under his abdominal skin to pump Baclofen through a catheter

---

[2]Tetraparesis, or quadriparesis, is weakness of all four limbs. Stedman's Medical Dictionary, 1303, 1580.

[3]Baclofen is used to treat muscle tightness and cramping caused by certain conditions, such as spinal cord injury/disease, cerebral palsy, and multiple sclerosis. WebMD, http://www.webmd.com/drugs (last visited August 14, 2009).

[4]Hydrocephalus is a condition marked by an excessive accumulation of fluid, which dilates the cerebral ventricles. This accumulation thins brain tissues and causes separation of cranial bones. Stedman's Medical Dictionary, 731.

into his spine. During a Medical Center examination, he was noncommunicative, opened his eyes spontaneously, did not follow simple commands, withdrew from painful stimuli, and had abnormal muscle tone, especially in his legs. His diagnosis remained spastic tetraplegia.

14. On October 24, he continued to suffer from severe traumatic brain injury, autonomic dysfunction, muscular spasticity, possible hypertrophic osteoarthritis in his elbows, and incontinency. His tracheostomy was capped during the day. His hydrocephalus continued to be treated with a shunt. He also suffered from mild improving anemia, dysphagia due to a decreased level of alertness, and mildly elevated liver enzymes.[5] He had no skin breakdown. On October 24, an endoscopic gastrostomy tube was inserted.

15. On November 13, 2008, Mark was transferred to Garden View Care Center (Garden View) for constant skilled nursing care. On December 16, Dr. Alvarez injected botulinum toxin to relieve his muscular spastic quadriparesis. The amount of Baclofen being administered by the pump was evaluated. At Garden View Mark underwent aggressive therapy. On January 18, 2009, Mark had progressed to being able to sit in a wheelchair with supports. He was able to look around the room and at a source of voice. He laughed when his granddaughter made funny faces. His muscle tone had improved, mainly in his elbows, fingers, and knees. On February 12, 2009, Mark was evaluated for a seizure. Antiseizure medication was begun. On February 27, Mark was seen in the emergency room and pneumonia was diagnosed. By May 5, 2009, Mark had developed sores in his hands due to the contracture of the muscles of his hands. Splints to keep his fingers open were being evaluated. An examination indicated another recent seizure. The nurses were able to say things to him to cause him to laugh. In May, his family was asked to consider whether to discontinue feeding him by mouth because of the risk of aspiration and resulting serious infection. To avoid this problem, he would be fed by tube. On July 7, Mark underwent surgical tendon release to relieve the

---

[5]Hypertrophy is the general increase in bulk of a part or organ, not due to tumor formation. Stedman's Medical Dictionary, 746. Dysphagia is trouble swallowing. Id., 478.

flexion contractures of his hands.  Later in July, Mark was treated for a urinary tract infection.

  16. As of June 11, 2009, it was Dr. Alvarez's opinion and the court so finds:

  a. Mark Tiburzi is very severely impaired, even though he has somewhat improved anatomically.

  b. Mark's brain continues to have severe cell damage, even though the bleeding has ended.

  c. He has neuro-cognitive, functional, and motor deficits.  He will never become functional.

  d. For the rest of his life, he will be dependent on skilled nursing and medical care, in a skilled nursing center, for all of his life functions.

  e. For the rest of his life, he will need special mattresses and other durable medical equipment, such as special wheelchairs, and a system to lift him out of bed and transfer him to other equipment.

  f. For the rest of his life, he will need constant care to avoid pneumonia, urinary infections, and other conditions.

  g. For the rest of his life, he will need constant care and treatment for relief of muscular spasticity.

  h. For the rest of his life he will suffer from autonomic dysfunction and dysregulation of the brain, for which he will need periodic evaluation and medication.

  i. For the rest of his life, he will have no control over his bowels or his bladder, and will require constant catheterization or the use of diapers to prevent sores.

  17. Mark Tiburzi's life expectancy is to age 77.8.  Although now considered to a degree to be in a vegetative state, from which he is not expected to recover, Mark has responded in an apparently emotional way to some personal stimuli at the Garden View Care Center.  He has apparently laughed with his infant grandchild and has laughed at humor therapy.  With appropriate care, his prospects of living to age 77.8 are substantial.

18.  Following the motor vehicle collision of July 15, 2008, Mark Tiburzi has been and will be unemployable in any capacity for the rest of his life.

19.  But for the motor vehicle collision of July 15, 2008, he would have more likely than not remained employed comparably to his employment before the collision until he would have retired from employment at age 66.3.

20.  As a direct result of the motor vehicle collision on July 15, 2008, Mark Tiburzi has suffered and is reasonably certain to suffer in the future[6] the following damages:

    a.    Lost earnings from July 15, 2008
         to August 10, 2009:    $    80,466.00;

    b.    Present value[7] of lost earnings
         from August 10, 2009 to
         retirement at age 66.3 years:    939,153.00;

---

[6]    A plaintiff is entitled to recover for future damages as long as he or she can prove the damages are reasonably certain to occur. . . . "The degree of probability of such damages must be greater than a mere likelihood; it must be reasonably certain to ensue. . . . Consequences which are contingent, speculative, or merely possible may not be considered." . . . Usually, future damages are a matter of medical opinion that require expert medical testimony.

Berthelsen v. URS Corp. --- S.W.3d ---, 2007 WL 4104092, at *2 (Mo. Ct. App. Nov. 20, 2007) (internal citations omitted).  In this case, the testimony of Lizette Alvarez, M.D., supports the court's findings that Mark Tiburzi's physical and emotional injuries, and the consequential compensatory damages, were caused by the motor vehicle collision on July 15, 2008, and are reasonably certain to the extent of his life expectancy of 77.8 years.

[7] The court accepts the net real discount rate of 1.5% employed by plaintiffs' expert, Leroy J. Grossman, Ph.D.  In his report dated May 21, 2009, in which Dr. Grossman reported the present value of Mark Tiburzi's lost earning capacity and his lost services, Dr. Grossman described his rate as conservative and reasonable.  Pl. Ex. 30.  In a letter report of July 6, 2009, in which Dr. Grossman reported the present value of Mark's future medical costs, Dr. Grossman provided the calculations for the assumption of net real discount rates of 1.5% and 0.0%, the latter resulting in higher present values of future damages.  No persuasive expert basis for accepting a 0.0% net real discount rate has been submitted to the court.

```
     c.   Medical expenses from July 15, 2008 to
          July 27, 2009:                                        854,130.00;

     d.   Present value of medical costs and
          expenses from July 27, 2009 to
          Mark Tiburzi's age of 77.8:                         4,500,000.00;

     e.   The value of Mark Tiburzi's
          non-economic damages of pain,
          suffering, and loss of the quality of life:    7,500,000.00
                              TOTAL DAMAGES:          $13,873,749.00
```

21. As a direct result of the motor vehicle collision on July 15, 2008, Cheryl Tiburzi has suffered and will suffer in the future the following damages:

```
     a.   Present value of the loss of the
          services of Mark Tiburzi until the
          previously anticipated retirement of
          Mark Tiburzi at age 66.3:                     $    251,369.00;

     b.   Present value of the loss of
          consortium with Mark Tiburzi from
          July 15, 2008 until his anticipated death
          at age 77.8, not including the loss
          of his services:                                  4,000,000.00.
                              TOTAL DAMAGES:          $4,251,369.00
```

## CONCLUSIONS OF LAW

The plaintiffs and the defendants are citizens of different states and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. Therefore, the court has diversity of citizenship subject matter jurisdiction over the action. 28 U.S.C. § 1332(a)(1).

The evidence adduced during the trial proved it more likely true than not true[8] that defendant Jeffrey Knight on July 15, 2008, while employed by defendant Holmes Transport, Inc., and while operating the tractor trailer truck unit on Interstate 64-40 near its intersection with Interstate 270:

(1) failed to keep a careful lookout[9] for the vehicular traffic ahead of him by turning his eyes from the road ahead of him to the inside of his truck cab to locate and to obtain in his hand his cell phone;

---

[8] E.g., McBride v. Farley, 154 S.W.3d 404, 408 (Mo. Ct. App. 2004).

[9] E.g., Luallen v. Reid, 58 S.W.3d 50, 53 (Mo. Ct. App. 2001).

drove at a speed that was excessive for the vehicle-congested condition of the lane in which he drove his tractor truck unit; and drove at a speed that was in excess of the applicable posted speed limit; and

(2) was in all such respects thereby negligent in that he thereby failed to use that degree of care that a very careful person would use under the same or similar circumstances;[10] and

(3) as a direct result of such negligence, plaintiff Mark Tiburzi sustained damage in the total amount set forth above, and plaintiff Cheryl Tiburzi, as a direct result of such negligence and the injuries to her husband, sustained damage in the total amount set forth above.

In consequence, defendant Jeffrey Knight and his employer defendant Holmes Transport, Inc., by reason of Knight's employment and the doctrine of respondeat superior,[11] are liable jointly and severally for the total amounts of the damages sustained by plaintiffs Mark Tiburzi and Cheryl Tiburzi set forth above.

No evidence was adduced at trial that indicated that defendant Holmes Transport and Logistics, LLC, employed defendant Jeffrey Knight when he operated the co-defendant's tractor trailer truck on July 15, 2008, in St. Louis County. No evidence indicated a factual and legal basis for holding this defendant liable for the injuries and damages suffered by the plaintiffs. For these reasons, plaintiffs' claims against defendant Holmes Transport and Logistics, LLC, are dismissed with prejudice.

During the non-jury trial proceedings, the court severed for a separate trial the claim of intervenor Famous Footwear/Brown Shoe Company, Inc. for subrogation against the plaintiffs of the amount of workers compensation damages it paid to plaintiffs. *See* Fed. R. Civ. P.

---

[10] E.g., Luallen, 58 S.W.3d at 53.

[11] "[R]espondeat superior imposes vicarious liability on employers for the negligent acts or omissions of employees or agents as long as the acts or omissions are committed within the scope of the employment or agency." Berthelsen, 2007 WL 4104092, at *2 (quoting Caballero v. Stafford, 202 S.W.3d 683, 694 (Mo. Ct. App. 2006)).

42(b).[12]  Because the claim of the plaintiffs against the defendants is not in any way dependent upon the claim of the intervenor, there is no just reason for the court to delay entering final judgment on the claims of plaintiffs against defendants.  See Fed. R. Civ. P. 54(b).

An appropriate final judgment order on the plaintiffs' claims is issued herewith.


   /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 20, 2009.

---

[12]By separate order the court has scheduled further proceedings on the subrogation claim of the intervenor.